Welcome, everyone, to the Fourth Circuit Court of Appeals this morning. And Judge Harris and I are particularly pleased and honored to welcome our friend Judge Hazel from Maryland to sit with us on the Fourth Circuit. Our first case is Bauer v. Lynch. Mr. Scarborough, good to have you here, sir. May it please the Court, Charles Scarborough for the FBI. I would like to try to preserve five minutes for rebuttal. The FBI reasonably determined that a base level of physical fitness is necessary to complete the physically demanding training program for new special agents. In 2003, after the FBI experienced recurring problems with trainees becoming injured or having other difficulties with the intense physical demands of the training program, the FBI decided that more rigorous physical fitness testing was necessary and sought to develop a fitness test that would provide a valid measure of overall fitness. And based on recommendations from subject matter experts in its training division and from the Cooper Institute, the FBI selected four events to measure the components of fitness needed to safely train and then went to considerable lengths to ensure that the physical training program's passpoints measured equal levels of fitness in male and female trainees. As explained in the study by Dr. Amy Grubb validating the PFT, the FBI analyzed scores from 322 trainees from seven prior NATP classes and set the minimum passpoints at about the 15th percentile for each sex. And in this way, they adopted a test that measures the same level of fitness for men and women. Now, the district court recognized that the FBI, and I'm quoting here, did not intend to favor or exclude one sex over the other. And he also recognized that, quote, the PFT provides an objectively verifiable measure of physical fitness. Nevertheless, the court held that the PFT discriminates against men because, in its view, Title VII prohibits any differential treatment based on sex, regardless of the average physiological differences between men and women. So this is all about push-ups? That was the component that the plaintiff failed here. This is not the case as a whole is not all about push-ups. The case as a whole is about whether it's valid and appropriate for the FBI to require a minimum level of fitness for this rigorous training program and for them performing the duties. But the part he failed was push-ups. The part he failed was push-ups. Correct, Your Honor. But he failed it on one push-up. He failed it multiple times on, yes, on varying levels. But one, the closest he ever came was one. Yes, correct, Your Honor. That's the way I would put it. The men were supposed to do 30, and he did 29. That's correct, Your Honor. And the women were required to do 14. That's correct, Your Honor. And, again, there's no dispute in this case that that, what you're trying to get at there, because men and women are indisputably physiologically differently situated in terms of ability to perform those sorts of tasks. They have aerobic differences, upper body strength differences, and that the accepted way That's what the government's position ends up coming down to. Well, yes. Whether you can gender norm on that basis and still, under Title VII, be treating everybody equal. Yes, Your Honor. And, again, Where the 30 and 14 are the same thing because women and men are a little bit different. Well, yes, they're a lot different. And because, at the end of the day, what you are measuring is fitness. And, again, in the field of exercise physiology, it's well accepted, and it's really accepted in this record. The district court accepted it as well. And that's why I emphasized the quote that the district court found that this is an objectively verifiable measure of physical fitness. It's at the 15th percentile for both sexes. Now, what's that mean, that 85 percent are going to pass it? Eighty-five percent are going to pass it. And, again, that's, I want to make sure that the court understands that what that meant is 85 percent are going to pass it within the pool of the prior, you know, applicants, the prior people. Eighty-five percent of the men are going to do 30 or more. Eighty-five percent of the women are going to do 14 or more. Yes. That's what that means. That's what that means. If you're in the 15th percentile. Right. What I was trying to say. But here you say that the agents or the trainees that you had trained over a period of time, you, the FBI, actually passed. Ninety percent of them of each sex passed. That's right. So you all did a little better than the mean. Well, the 85 percent was based on the prior training classes. That's what I was trying to get at. In other words, when we were trying to validate the test back in 2003, and the Grubb Validation Report goes through this, that's at JA 196. It goes through this in great detail. What we were trying to do was impose an equal burden on men and women with respect to fitness, because fitness is an important foundation for being able to participate in this rigorous training program in which you could get injured, you could have other negative results. That's the point. Can I just, if you can clarify for me, then why do they test so late in the program? If the point is that you're trying to screen for people who can successfully complete the program without hurting themselves, what's the point of testing at like week 22? I think it's a point that we are very much invested in the FBI agents. There's no incentive to ever knock anyone out. You have a position. When someone is accepted into the NATP training program, you have a funded position. You have a special agent job you can offer. So you want these people to train up. You have every incentive for them to do well. And so the FBI gave them multiple opportunities. That doesn't in any way undercut the notion that what you're trying to do is have a foundation of fitness and that you arrive there. The idea of giving them multiple opportunities is also that, okay, well, now we're going to make sure that you build up. The expectation is that you build up your base level of fitness so you don't have injuries, you don't have sickness, you don't have all the other negative outcomes. How many weeks is the training? The training program at the time he took it was 22 weeks. It's varied a little bit between 20. When he got to 29, it was like in the last week or something. I'm not sure whether. I'm not sure whether the 29 was the very last one, Your Honor. The district court's decision charts it out. There's no question that he missed by a narrow margin on a number of occasions. But one of the purposes of the physical fitness requirement, I was looking at the requirement documents that are handed out to people that explain that you're going to be required to do X number of push-ups as a minimum level. And one of the things that the requirements document says is this is not just a measure of fitness. It's also a measure of your commitment to the FBI to getting yourself into the proper shape. And, yes, it is a bright line rule. And, yes, in some ways it may seem harsh to have one push-up be the difference between going in or out. But lines have to be drawn. And, again, the FBI tried to mitigate the harshness of the rule by allowing multiple opportunities. So, Judge Harris, in response to your question, I think that's a good thing. The FBI really was trying to give people lots of opportunity. But it's quite clear that the purpose of this physical fitness requirement is to have a foundational level of fitness coming in. In other words, they want you to pass that very first fitness test. They don't want you to be taking a fitness test at week, you know, 14 or, you know, further down the line. In fact, those last two tests that were allowed, it's quite clear, are discretionary. They're allowed at the discretion. And so one of the discretionary things may be to pass it the first time, he wouldn't have to do it anymore. That's correct because you've demonstrated a base level of fitness to the FBI's satisfaction. And, again. You used the phrase equal burden earlier. How is it an equal burden if a man doing 29 does not pass but a woman doing 29 does pass? How is the burden the same on each? Because the way, again, the way you measure fitness is by the percentiles. And it's accepted in the field of exercise physiology that the men and women are, I mean, we sort of all know that from growing up, from, you know, taking presidential physical fitness tests, where there are different standards. In some cases, there are different things, different events that people, I mean, when I was growing up, the boys had to do a pull-up thing and the girls got to do a flexed arm hang. There are differences in physiology that are widely accepted in the area and were accepted for purposes of this case. And the district court didn't, you know, say that that was in any way untrue. The district court said it was irrelevant. And what we're saying is that the proper metric here, the proper yardstick, is fitness. And as to fitness, it is equal to require the 30 versus the 14. Right. I do think I understand your point that you don't just look at the push-ups as the metric. You look at the fitness as the metric. The fitness metric, as I understand it, the metric that you sort of created by looking at these various factors. Now, if you've made it easier for one group to achieve the metric, then you've made it for the other group to achieve the metric. Is that not discrimination? No, Your Honor. And I guess I would object to the sort of predicate part of your question. You said it's something that we've created. It is not something that we've created. I would refer the court. There's lots of places in the record that demonstrate this. But to the testimony of our expert physiologist, William McArdle, who said the selection of gender norm standards based on equivalent percentile rankings results in men and women of the same fitness level passing the PFT. In other words, this is the way this is done. And I would point the court also to the Third Circus decision in the Lanning case, which was a disparate impact challenge to a unitary physical fitness standard. It was basically a 1.5-mile run. Do you think that's right on the money, that Lanning case? Well, no, Your Honor. I think it's instructive in the sense that what the court said in rejecting the unitary physical fitness standard. What have you got here that's right on the money other than that administrative law judge at the EEOC? Yes, Your Honor. Because that was the FBI's physical fitness. That's this case. That's this case, exactly. Is there anything else that's on all fours? The Powell case is also basically on all fours. That's the one in? That's the D.C. District Court case. In D.C.? Yes. That was another validation of the FBI's test. There are some state court decisions. But what I was trying to get at with the Lanning case in the Third Circuit is that was a disparate impact challenge to a unitary standard. So that was a different type of case. But it was basically pointing out that when you say men and women both have to run 1.5 miles, and I forget what the time was, 12 minutes, whatever it was, that has a significant disparate impact based on the physiological differences between the men and women. And what the court pointed to as a way you could permissibly do this, a nondiscriminatory way of getting at fitness, which is a base-level thing that you might want to test for a transit authority officer, was to test at the same percentiles, in other words, to exclude at the 50th percentile. And so we think that's instructive as to how another court of appeals viewed these issues because we recognize there isn't much precedent here, Judge King. I mean, you're pointing out that we have an EEOC administration. How do the military academies do this? The military academies, some of them, I'm honestly not sure. There is some record evidence in this case that there is some gender norming. I don't want to represent that it's across-the-board gender norming. And there are different types of tests here. There's a statutory provision that authorizes them to gender norm. There is a provision. And the VMI case, of course, recognizes some adjustments to, you know, the physical training. The VMI case came out of this court. That's correct, Your Honor. But the Supreme Court, you know, in compelling VMI to admit women. It's a court decision. They refer to this. They do. They say that some adjustments to reflect the innate physiological differences may be necessary. So in our view, this is not something that sort of we've created or, you know, we're offering as a sort of novel new concept. This is the way it's done. No court has ever invalidated a gender norm. Your brief says that this is like a Department of Justice position that particularly says the Civil Rights Division has brought suits based on this theory. That's correct. In the Civil Rights Division's capacity enforcing Title VII against state and local law enforcement agencies, they, from time to time, bring suits dealing with a unitary physical fitness standard. In other words, if you have a standard, you know, that, again, like the landing case where firefighters have to run, you know, 1.5 miles in X time, and if it has a significant disparate impact and you don't have a job-related reason for doing that, they bring suit against that. And one of the possible remedies that could result from that suit, and often does in the settlement agreement portion of it, is to have the gender norm standard. So what I'm trying to get at with all of this discussion is that this is not a novel concept. This is not something that the FBI has made up. This is a way of trying to impose an equal burden on men and women, get people with a foundational level of fitness who are prepared to go through this program and become special agents. Now, is the FBI prepared to, over time, to adjust these things if they come out, that the numbers, they say now they're 90% and 90%. 90, well, at the end. 90.2 and 88, 9.5. I think at the end of the day. If they come out five years from now and 70% of the women are passing and 95% of the men are passing, do they adjust the numbers? I'm not aware of any statistic like that. The FBI is reviewing it. Again, when the FBI first implemented this in 2003, they did then in 2005 another validation study by Dr. Amy Grubb. That is also in the record. In other words, they looked back and said, okay, here's our pilot study. Let's look back at now the next seven NATP classes and let's see whether it's producing the expected results. And it was. So, Judge King, I think, generally speaking, yes. If the numbers are skewed, the FBI has every reason to try to be imposing equal burdens. And that's what the case law in this area talks about is are you imposing equal burdens? If you're imposing an unequal burden on men and women, then the Earwood case and the Gerdaum case, they all say, well, that's when you get into a problem. We're not imposing an unequal burden here. We're measuring the same level of fitness. And that's the problem with the district court's analysis is it didn't focus on fitness as the metric. It focused on the raw outputs. Just a quick procedural question. So the relief you want, the district court entered summary judgment for the plaintiff. Do you want us to reverse that? Are you asking us to direct summary judgment? Yes, we are. And I'm sorry if that was not clear. I noticed in the conclusion section of our brief that we did not specifically ask for that relief, but I want that to be abundantly clear. There were cross motions for summary judgment. There are no disputed facts, really, here. Well, it looked like there were a lot of arguments about what was disputed and what wasn't disputed. And you all said they weren't relevant? The district court's decision does not rest on any disputed facts. You couldn't have granted summary judgment for the plaintiff if it were true. The district court basically just said it's legally irrelevant that this imposes equal burdens on men and women. And that's the fundamental flaw. And the reason why he said that is he was focused on the actual output in the specific training event as opposed to fitness as the proper metric, which is strange, because he recognized that the test is an objectively verifiable measure of physical fitness. And that's a fundamental legal error that we believe the court should correct and enter summary judgment in favor of. Why didn't you argue RISI as an alternative, just in case they had come out the way they did? Because in some respects, it's inconsistent with the notion that you're measuring equal levels of fitness. RISI is a defense focused on where you're going to treat them unequally, men and women unequally, but you need to do something different in order to make sure you don't have a massive disparate impact on women. There is an element of this case that certainly goes to the same thing. In other words, that if you were to have a unitary standard of fitness that would have any meaningful screening measure for men, it would be set so high that you would have a very high adverse impact on women. Whether it would satisfy the RISI strong basis in evidence test, which is a very stringent test, as the court knows, is something that we felt like it at least had to be in the FBI's mind that they were thinking about disparate impact liability, and there wasn't really record evidence of that. So we focused on the fact that this is not unequal treatment at the threshold and is not discrimination under Title VII. I'd like to try to reserve a little bit of time for rebuttal, but I'm happy to... If we disagree with you on the discrimination point, do you win under the RISI? We think that there... I think that probably it would be difficult to rule... Which you didn't preserve, but you say the district court preserved for you. Well, the district court went out and reached it, and went out and reached the BFOQ defense as well. And again, we didn't argue those things, and I've tried to explain why we didn't argue the RISI defense. I'm happy to try to explain why we didn't push the BFOQ defense. The reasoning is the same, largely because we thought we had... Which one of those is better for you, if you fall back on one of them? I can't make a predictive judgment as to which is better. You went on both of them? I don't think we went on both of them on this record. I think that if the court were to disagree with us on our threshold, maybe a remand for examination of those issues would be appropriate because the court has injected them in, and we've pointed to certain errors. So you can't get summary judgment on either of those? I don't think the record is sufficiently developed. You're saying you can get summary judgment on the main issue? Yes. Not discriminatory? Right, and I don't think it's necessary for the court to... I mean, those are, in some respects, harder issues. The threshold issue that this is measuring equal levels of fitness and therefore is not discrimination is actually a relatively easy issue. Thank you, Your Honor. Thank you, Mr. Scarborough. Ms. Andrew? You don't agree with much of that, do you? No, I don't, Your Honor. Good morning. Michelle Andrew on behalf of plaintiff with my colleague, Craig Riley. No, we disagree on many fronts, and the district court did as well. The district court did not say that this same level of fitness, that this has no... Well, he did say it was irrelevant, but it's basically a two-step analysis. He said that they did not... That argument, and it is just argument, it's not recognized in the law that that goes against establishing a prima facie case of discrimination. And then the second point, once the... So the court said that we did establish a prima facie case of discrimination. When you're talking about an employment policy or practice, the United States Supreme Court has made clear that it is, are they facially different? 30 push-ups is different than 14 push-ups. Are you saying the number had to be the same? For facial discrimination, that doesn't mean that physical fitness tests are always impermissible. That just means that we meet our prima facie case of explicit facial discrimination, which the court said, which the government or anybody using those tests would then have to legally justify under a lawful justification that is in the law, which would have been a BFOQ or the Ricci standard, which they chose not... Can I ask you about the BFOQ? Because this confused me. So your own brief cites this Easterling case, the district court case. I think it was from Connecticut. And that case says a disparate cutoff point can never be a BFOQ. That's a crazy way to think about it. Differential levels, sort of by definition, both of them can't be BFOQs. So if you're citing that case, I mean it sounds like you really are coming pretty close to saying whatever the district court thought, you disagree. You actually think it can never be a BFOQ. No. I think that I could see why you would ask that question, but it depends. Then we come down to the use of the test, which you brought out right away. There could be. The government has consistently argued that it was one of the main purposes of this was to assess fitness to train. Perhaps there could be a BFOQ that was related to being a trainee at an academy, as a screening tool. But by definition, cutoff times that vary by gender, when you're talking about the same job, when you're using it to assess an ability to do the same job with the same physical tasks at the same physical level, I do think that that would be a problem, being a BFOQ. So the way that they used it at the end of training to assess the ability to do the same job with the same physical tasks, no. As the Easterling Court pointed out, how can they vary? We are not talking about the Olympics. We are not talking about a presidential fitness award where you might use different standards to judge. Title VII governs jobs. We are talking about a job with the same physical tasks at the same level. You asked about the military. The military has made clear that with combat roles, the standards need to be gender neutral, and they are. In fact, just this year, two females passed the Armored Ranger standards. Is that in this record? I believe in the legislative history. I believe that we do have that in the underlying record. What about the military academies? Ms. Scarborough said that's not in here. But they're authorized to treat them differently by the code. I'm sorry, the code? At the military academies, they're authorized to do it the way the government explains it. Now you're talking about the job of a combat role. In 1975, they amended the law. They put a provision in the statute on that. 1975 for the military academy. Okay, well, we're talking about a job here. And the military academies, I believe, when you're talking about fitness to train, which is what the defendant says they're an expert, talks about Dr. McArdle. The evidence is that for you to win, it's got to be, we have to view the evidence in the light most favorable to them. At 30 and the same, 30 and 30, that 27 times as many women would fail the test as men. Right, but there's nothing in the record that 30 push-ups is needed to do the job of a special agent. And then that would be the Ricci case. The Ricci case looked at this tension between, okay, potentially there would be a disparate impact, but can we engage in facial disparate treatment to, as a prophylactic measure, to avoid a disparate impact. Are they testing them to pass this training program? 22-week training program. Yes, yes, and this is an individual that went through, he passed the physical fitness test as a screening tool. He passed it before he got there. It makes no sense that he then went on through the training program in a very highly competitive environment. You know, Mr. Scarborough referred to that it's not just physical fitness, it's sort of the commitment to the job. Six years in litigation, this gentleman is committed to this job. Through the training program, highly competitive environment. His peers voted him class leader, class spokesperson. This is not somebody who is not trying to do this. He tried. He did everything the FBI required to do. He passed all gender-neutral requirements. Now, that's defensive tactics. They admit that he's a good intelligence agent. Absolutely. Everybody acknowledges that. Absolutely. And he, you know, just so you understand the training program, all the gender-neutral requirements, they require physical tasks too. All men and women have to prove that they can subdue a recalcitrant subject, handcuff a subject, tactical driving, firearms. He passed everything with flying colors. But at the end of the training, they said that 29 push-ups, they essentially plucked him out of line to receive his badge and credentials. Twenty-nine push-ups mean you cannot do the job. That's the same rule all over again. But a woman doing. At the end, according to Mr. Scarborough, if he had finished 30 of them the first time, not the fifth time, the first time, he wouldn't have had to take any more. Right. That's right. And that would gel more. The first time he did 25 or something. He kept getting a little closer. He finally got to 29, but time ran out on him. Right. And, Your Honor, you have to understand, too, this test is in sequence. You know, I just competed. This is a serious matter, though. You're getting the courts involved in running the FBI agent training program. Oh, we don't want the courts to involve. And I think the district court went out of its way to thoroughly. . . They know more about it than three judges pulled out of a wheel. Right. But you're also, Your Honor, where it violates, where a standard violates the law, we need to intervene. And this violates Title VII. This is what Title VII. I didn't think it did. He had the same case, and he made a decision right on point against you, the Administrative Law Judge for the EEOC in 2010, on the same evidence, the same expert, that Amy woman, Amy Grove. Your Honor, respectfully, I disagree that it was the same case. Mr. Hale was. . . It looked like the same case. I read it. It looks like it. In that case, it looks like it's on its face. When you plumb the depths of it, Mr. Hale, they specifically pointed out that he had other issues going on besides the PFA. . . But this is just sort of the nature of right-line rules, right? This is how a cutoff operates. It always looks bad for the person who comes in at 29. I mean, 29 and 30 aren't that different, but if you're going to have rules, that's just the way they operate. I don't see why it matters that Mr. Hale was even further off from the. . . That's just life, right? Sometimes you're just a little bit under the cutoff. Right, Your Honor, but it does. . . would not satisfy the simple test announced in City of Los Angeles v. Manhart where but for the gender, the outcome would be different. I understand, but I'm just saying there's no difference between Mr. Hale at. . . They're both under 30, and so I don't see how we distinguish the cases that way. Right, but there was. . . The physical fitness test, I'm sorry if I wasn't clear, was not the only reason why Mr. Hale was terminated in that case. But they upheld the application in this EEOC decision. They upheld the validity of this physical fitness test, right? They did, I believe, on faulty premises. They accepted the within the gender scoring methodology, which if you plumb the depths of the issue, which just to be clear, Mr. Hale did not even respond to the summary judgment motion. So the court did not plumb the depths of this issue. Can I just ask you a question? Are there any courts coming out your way on this? This specific issue, I believe, has not been squarely before the court. No court has ever said that gender norming for physical fitness tests is a violation of Title VII. We'd be the first. Well, then we have to limit it to these specific facts of this case. I believe that under. . . I'm just asking a general question. Forget the specific facts. Can you point me to any precedent saying that gender norming for physical fitness tests violates Title VII? There has not been a case at the end of training where someone has used the physical fitness. It doesn't even have to be the FBI. Just anyone, anywhere. I know lots of law enforcement agencies do this. I read the state law cases approving it. I read the federal district court cases approving it. Is there anyone saying it violates Title VII, or would we be the first? You would be the first to say that physical fitness in this context, but I believe that it is not as well established. Are there other cases in a different context saying that gender norming physical fitness standards violates Title VII, even in a different context? Well, the most analogous context are these insurance cases that United States Supreme Court have come down on, the fetal protection policies. It was all rooted in physiological differences, right? And it is not uniform. No one else uses a test, a physical fitness test, to assess who can and cannot do a job at the end of training. They're alone on that. No one uses it just to gender norming, without age. There are some agencies that use, that this is in the record, that use it to assess fitness as a motivational tool, as to screen candidates before they come in. But then, even the All Spa case, the Wichita Falls case, those cases said it's different when you're using it as an inclusive at the beginning to get as many candidates in. But then when you're talking about who can and cannot do the job, that needs to be a single standard. That's what Title VII protects. If I may, the FBI would say, right, and when we do the job simulation tasks, the one you refer to, can you subdue a suspect, can you be on the spot team, we don't gender norm. We do everyone by the same standard. Because that's where we're measuring your ability to do the job, rather than general physical fitness. What's wrong with that? Right, well, but they use the test. Okay, so how does it make sense that they do the actual job simulations, a male passes all of those, everything else that's gender neutral. But then they say they deny him his badge and credentials because he didn't do, he did 29 push-ups, not 30, when a woman doing 14. I just, that doesn't make logical sense, and I don't think that's supported by the case law. The case law says Title VII protects the individual. Title VII, in the Manhart case, International Union v. Johnson Controls, even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply. The FBI would say that, again, the appropriate metric is not the number of push-ups, the appropriate measure is the level of fitness. And in that way, it is the same for both.  That the, first of all, we have always disputed that it's measuring the same level of fitness. They have a lot of studies. All they have, well, they have studies, if you look closely, that suggest how a given group at a time, in 2003, did on a test. I'm saying on, if the court is inclined to, if the court believes that the same level of fitness or that it should follow the Ninth Circuit's unequal burden argument, then we believe that the undisputed facts reveal that this was not even an equal burden. I mean, we have evidence, they point to a lot of statistics of the overall physical fitness test. For you to prevail here, the facts have to be given to the government. Because they're on the other side of you. They're the ones that lost. The facts go to them. Right. So, there can't be disputed facts. You can't dispute any of the facts that are in favor of the government. Right. Well, you have to look at it in the light in which favor of the government. Right, exactly. Which we believe in terms of the unequal burden. I don't believe that they can, if you are inclined, if you believe that the Ninth Circuit's unequal burden, that that applies in a physical fitness context, which I would argue, too, that they clarified, the Ninth Circuit clarified after that initial Jerdome case that keeps getting referred to. Where, actually, the Jerdome court said that that case was, they cited to these earlier precedents with this personal grooming and appearance standards, that they actually invalidated the test that was at issue there. But the Ninth Circuit, in a later case, Jesperson v. Harris, was 2005, clarified that test and said that it was in the context of personal grooming and appearance. Where it's plain that involved a woman had to wear makeup and a man didn't. And that's the line of cases. It is really, it was borrowed from that. I think the Powell court, the D.C. Circuit court, you know, needed that sound bite. That was another case where this individual, and I accept your position that, you know, he failed miserably, but it wasn't squarely before the court that, okay, this person would otherwise be an agent, but for this different standard. This person has passed all of the gender-neutral requirements, but for this different standard. The level of fitness standard is the same. They've done tests and studies to show that when you take into consideration the differences between men and women, that's the same burden for both, the same level of fitness for both. Why is that a problem? And I don't think that they have established that in the record. I believe that that's their argument, but that it is not the level of fitness, and that it needs to relate to the job and the job qualifications. But can you tell me, so just, this would be very helpful to me, where are the sites, or where in the record will I find kind of the dispute over whether this is measuring an equivalent level of fitness? So I know where the FBI sites are, all the parts in the expert reports and the studies where it says, no, that's 15%, 60%, we're measuring the same level of fitness. Where, why do I look at to show me that there's a dispute about that? The, well, it's in our joint statement of facts, and from the very beginning of our complaint, we said that if, in the alternative, we argued in the alternative, we believe that it was facially discriminatory, but we argued in the alternative that if you accept that position, the Ninth Circuit unequal burden, there are all of the data that goes beyond it. The testimony and expert data, you know, I would have to give you a citation, but we have a, yeah, and I'm sorry, I don't have the site right now, but, you know, we do have evidence in the record that from 2005 to 2012, you know, out of 35 individuals that failed the overall physical fitness test, over 60% failed because of the pushups. All 22 of those, all 60% were males. So there is record evidence that the men were failing the pushups. There's testimony that they failed the pushup. They argue, to your point of, they're measuring the same level of fitness. They are incorrect. They refer to their SWAT standards and HRT standards. They say that they use a single unitary standard. Well, how does that square? Then are they discriminating against the women there? Are they not measuring the same level of fitness because they want to call it a job task simulation? But I do have a site for that in the record where you go to the, they're requiring 50 pushups of both men and women for the HRT team. So how is that different? In the Lanning case, what they don't say is that it is a, they ultimately, the court approved the single gender neutral standard. It was the SEPTA, the Transportation Authority Police. They ultimately, it withstood despite a disparate impact. That's why they had to run the same amount of time? Right. They had to run, because they had evidence that said that is what's required for the job and that's how it was used in that case. Whereas our case, they don't have anything that says that 29 pushups for males is required for the job. The Third Circuit reversed that. The Third Circuit ultimately upheld those standards. Because those were job simulation tasks, right? The same ones that the FBI does in gender norm. Because that's, it's just sort of a business necessity. You have to be able to do the suspect. You have to be able to do this to do the job. But the FBI is saying it's measuring something different here. Not whether you can do the job, but your overall physical fitness. Right, but fitness for what purpose? They don't require any incumbents to, at the relevant time period. They didn't, and that's what the judge found significant. If they perhaps did require that, maybe it would be different. But they don't require fitness for what purpose? We are talking about the job. So they're saying that they applied it this way. I mean, unless we're in, I guess, maybe sort of a chicken and an egg thing. Unless you're into business necessity or BFOQ, they can require whatever they want, right? If they want people to be physically fit, they can have people be physically fit. That's true, but it can't violate. I think that we get back to the simple analysis that the District Court came down. Because we had multiple hearings on these issues. Because you would say on its face, yes, fitness is important. But how are they using that? And how are they using it? They want to call it a general fitness test, but they really did use it as a minimum level needed to do the job. And that's where it didn't make sense. And, you know, I mean, the United States Supreme Court, the plain language of the statute, they provide the framework for deciding this. This would be a created standard for a special carve-out for physical fitness tests, which is not in the legislative history of the statute if it's so well established. Why, when they enacted that Section L that said no different minimum cutoffs, why would they not have talked about it in the legislative history? They talked about the fact that this within-group scoring relative fitness or relative score is exactly what Section L was designed to prohibit. Section L, I'm sorry, I don't want to take it. Let me just ask you a quick question about Section L, because I was confused about this. Why does Section L apply to the federal government? There's a separate section that covers the federal government. It's a waiver of the federal government's sovereign immunity, and it lists out subsections that apply to the government, and L isn't one of them. But are we all in agreement that L does apply to the government? How do we get there? It does, Your Honor. How do we know that? I have the statute here, but it defines when you go back to the definition of employer, it does include the federal government there. So they have a special Section 16A under L, under all of the other requirements still apply in the definition of employer. The government argued that early on and I believe came around that indeed does apply. And so the legislative history is there is no carve-out for that Section L, and they talked about, you know, they wanted to say that the EEOC chairman's comments don't mean anything, the comments of Senator Kennedy don't mean anything, but the case law that they point out are sound bites from cases where the EEOC commented after the fact, you know, after the legislation, even, you know, Young v. UPS after CERT was granted, and that's not our case here. This legislative history that's pointed out was before the passage of Section L to explain what the purpose was, and there is no carve-out there. So you would have to jump from city of Los Angeles v. Manhart, all of the U.S. Supreme Court statements of this simple test of why this is facially discriminatory, you would have to say that those don't apply to this, that somehow that's a carve-out for physical fitness. The plain language of the statute, there would have to be a carve-out where there is none there. So I think that it is difficult to get around the plain language, difficult to get around that we did establish a prima facie case of discrimination, that they could have justified, tried to justify, but they didn't because they cannot. They cannot show it's a BFOQ, and they cannot establish a strong basis of evidence, which it sounded as though they conceded today under Ricci. Well, they didn't raise either one of those. Right. The court did. If we were to decide that the summary judgment was inappropriately awarded, what do you think we ought to do with the case? Send it back for trial or something or for the proceedings or award judgment to the government? Oh, I don't think that you can award judgment to the government. I think if you decided summary judgment was appropriate, that would be that you were saying that the Supreme Court precedent and the plain language does not fit in this situation, that there is a carve-out, and then you get into the unequal burdens. And we do have in our joint statement of facts, and we have always contested that it did result in an unequal burden for the males, and that was a substantially more difficult hurdle, the evidence. So I guess we would have to try that, but they wouldn't win. Why is it that the numbers on who passes is exactly the same, 90%? 90% of men pass? 90% of the women pass? Looks like that's about as equal as you can get. Well, if that's how you're defining equal fitness. If the gender norming is all right. Right. Well, in the overall physical fitness test, but what's at issue in this case was Mr. Bauer's inability to meet the generalization that a male should do 30 push-ups. Well, you said if that's how you're defining fitness. That is how they're defining fitness. Well, that's how the government is, but is that how the law would define equal burden? Those equal burden standards relate to personal appearance and grooming, which on the face, you know, is different. You know, a male has to cut his hair a certain level. Women only wear makeup. You know, physical fitness, there isn't anything that has defined what that means in terms of unequal burden. If it would be a disparate impact based on the overall test, then I guess they would win, but that would be legislating, and I think that would be reading into the law something that's not currently there. Thank you very much. We appreciate it. Good job. Mr. Scarborough? Just a few quick rebuttal points. I think an important place to start is what you heard there was a lot of the conflation of an overall fitness test with a job simulation test. They're different. We try to set that out in the brief, and I want to make clear that this is not some ex-post explanation the government has come up with for purposes of litigation. I want to quote from the Grubb report. That was the validation study. This is at JA-207, who said in 2003, the overall objective in this assessment was to determine an overall level of fitness and not, quote, the ability to chase a subject in a certain period of time. In other words, and this is really undisputed, the district court accepted this, a base level, a foundational level of fitness was deemed critical by the FBI to go through this training program to not get injured. This is a vigorous training program where people are grappling with one another, running around, you know, shooting guns. It is a long program. They had experience that suggested to them they need people to come in equipped. They had experience suggesting to them that people were often, trainers were often spending a lot of their time whipping people into shape, basically, and not, you know, teaching them the skills they needed to learn in defensive tactics. All of this is essentially undisputed on this record. There's a joint statement of facts that's really, it's a lengthy joint statement of facts. The front end of that is sort of accepted and completely undisputed. The back end has little responses where each side quibbles. Every time either side wanted to, didn't like the fact that another one put in, you'd say it's irrelevant, immaterial. I understand. That's the way you all did it. I mean, there's a lot of stuff that's implied that everything's irrelevant and immaterial. There is a lot of stuff. If you don't like it, it's immaterial. That's true. That's full of it. I looked at it. Well, actually, the first, what I was going to direct to you, Your Honor, I understand the court might be frustrated with that portion of it. There's a front end, actually, that the parties agreed on. There's none of it like, what, 55 paragraphs? Yes, but in that front end are some foundations. Do you think we can win on the 55 paragraphs, the undisputed part? I think we can win on both parts, Your Honor. And, again, the way the district court dealt with this is it said that, basically, most of this stuff was irrelevant because it focused on the differential outputs in the specific events as opposed to the measure of fitness while acknowledging in the specific findings. Any fact that favors them is irrelevant. I'm sorry? That's what you said. Any fact that favors them is irrelevant. They said the other side. Any fact that favors you is irrelevant. Your Honor, I was acknowledging how the court might be frustrated with that sort of back and forth there. But what I was trying to get at is the district court basically said that, acknowledged that these were unequal burdens. The fitness test was imposing equal burdens. It was an objective, verifiable measure of fitness, and then disregarded that, went to a different metric, if you will. And the front end part of the statement of facts, JA 451, there is, at paragraph 25, a statement that talks about why a base level of fitness is necessary to complete the NATP. It's not because you're testing specific job skills. As I think the court fully understands, with respect to the ability to shoot straight and things like that where physiological differences don't matter, the FBI requires women to meet the same standards on marksmanship and things like that. But there is a base level of fitness that the only way that you can treat men and women equally, in other words, not impose an unequal burden on women, is to gender norm with respect to those base level fitness requirements. And that's really the fundamental point that I think the court understands and the reason why we should win this case and the district court should be reversed on its Title VII hold. Thank you, Mr. Scarborough. Thank you, Your Honor. We'll come down and greet counsel, and then we'll call the next case.
judges: Robert B. King, Pamela A. Harris, George Jarrod Hazel